**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ‖ | |
| Plaintiff, | ‖ | No. 20-CR-46-CJW-MAR |
| vs. | ‖ | **ORDER** |
| DARYL HARDEN, | ‖ | |
| Defendant. | ‖ | |

_____

**TABLE OF CONTENTS**

I.  INTRODUCTION ............................................................................ 3

II.  STANDARD OF REVIEW ................................................................ 3

III.  FACTUAL BACKGROUND ............................................................ 6

IV.  ANALYSIS ................................................................................... 11

  1.  Characteristics of Defendant .................................................. 13

      a.  Defendant's Split Focus .................................................. 14

      b.  Defendant's Understanding of His Right to Withhold Consent ....15

      c.  Past Interactions with Law Enforcement ............................. 15

      d.  Defendant's Intoxication ................................................. 16

  2.  Aspects of the Environment ..................................................... 18

      a.  Secluded Location ......................................................... 18

   b.  Length of Interaction ......................................................20

   c.  Objection to Search.......................................................21

   d.  Withdrawal of Consent ..................................................22

   e.  Defendant's Mail...........................................................23

V.  CONCLUSION .....................................................................24

# I.     INTRODUCTION

This matter is before the Court on defendant's Objections (Doc. 40) to the Report and Recommendation (Doc. 37) of the Honorable Mark A. Roberts, United States Magistrate Judge.  On April 19, 2021, defendant filed a Motion to Suppress.  (Doc. 24).  The government timely filed its resistance.  (Doc. 30).  On May 5, 2021, Judge Roberts held a hearing on the motion and requested supplemental briefing from the parties.  (*See* Doc. 36).  On May 26, 2021, Judge Roberts issued his Report and Recommendation ("R&R"), recommending the Court deny defendant's motion.  (Doc. 37).  On June 9, 2021, defendant timely filed his objections to the R&R.  (Doc. 40).

For the following reasons, the Court **overrules** defendant's objections, **adopts** Judge Roberts' R&R without modification, and **denies** defendant's Motion to Suppress.

# II.     STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements).  While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask.  Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985).  Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time.  *Id*.  If a party

files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo. 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate [judge]'s report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review is non-deferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991); *see also Doe v. Chao*, 540 U.S. 614, 620–19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94–1609, at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect Section 636(b))). Thus, although de novo review generally entails review of an entire matter, in the context of Section 636 a district court's required de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1).

Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger de novo review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate [judge]." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has concluded that general objections require "full de novo review" if the record is concise. *Id*. Even if the reviewing court must construe objections liberally to require de novo

review, it is clear to this Court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Ass'n, Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996).

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996); *see also Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Federal Rule of Civil Procedure 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed).

The Court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (citation omitted). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this Court to believe

that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the Court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153–54. Thus, although a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

### III.   FACTUAL BACKGROUND

Defendant does not object to the relevant facts as recited in Judge Roberts' R&R. The Court therefore reviews this portion of the R&R for plain error. After reviewing the record, the Court finds that Judge Roberts accurately and thoroughly summarized the relevant facts in his R&R. (Doc. 37, at 4–8). Finding no plain error, the Court adopts and incorporates the R&R's factual findings without modification.

> The instant motions arise from Defendant's alleged knowing possession of five rounds of Ruger 9 mm ammunition on January 11, 2020. Defendant's possession of the ammunition is made illegal by his previous convictions for crimes punishable by imprisonment for a term exceeding one year, convictions for misdemeanor crimes of domestic violence, and because he was subject to "orders restraining him from harassing, stalking, or threatening an intimate partner." (Doc. 6 at 1-3).
>
> I found Sergeant Schmit to be a credible witness. Sergeant Schmit testified to many of the facts discussed below. Other facts are found in the exhibits admitted at the hearing. Sergeant Schmit has been an officer with

the Cedar Rapids Police Department ("CRPD") for almost 18 years and has been a sergeant for four years. Sergeant Schmit completed his training with the Cedar Rapids Police Regional Academy in 2003. Sergeant Schmit had "multiple days" of training in intoxication symptoms and behaviors at the police academy and has yearly basic skills training and updates related to the subject. He described his education related to drugs and drug intoxication as "an ongoing occurrence." During his career, Sergeant Schmit has conducted hundreds of stops for persons suspected of operating a motor vehicle intoxicated ("OWI"). Sergeant Schmit was a patrol officer until he was promoted to sergeant, was a patrol sergeant for three years, and began working with the community service division in April 2020. For all but one year of his career, Sergeant Schmit has worked the evening shift from 5:00 p.m. to 3:00 a.m.

At approximately 10:30 p.m. on January 11, 2020, Sergeant Schmit went to the St. Luke's Hospital emergency department ("St. Luke's" or "the hospital") to see a patient with a gunshot wound. Defendant was being treated for a gunshot wound to his left forearm. (Doc. 35 at 2, 6). By the time Sergeant Schmit arrived, St. Luke's was already on a hospital-ordered lockdown, pursuant to hospital policy when a gunshot victim arrives for treatment. Lockdown restricts persons from entering the emergency entrance, but not from leaving the hospital. Lockdowns are lifted after consultation with law enforcement. Officers Brown and Rink were with Sergeant Schmit and participated in questioning Defendant.

Sergeant Schmit testified that police officers interviewed Defendant as soon as they arrived at the hospital because they needed to know the facts surrounding the shooting. Law enforcement needed to locate the scene of the shooting, preserve and collect evidence, and learn about suspects so they could look for them and broadcast that information to other officers.

When officers arrived, Defendant was in a hospital bed in a treatment room with several medical personnel attending to him. (Rink video at 10:36:19-10:38:52; Brown video at 10:34:55-10:35:55). Two hospital security officers were stationed outside the treatment room. (Brown video at 10:34:15). The treatment room door was originally closed, but was propped open at 10:46:30 p.m. by medical personnel and remained open. (*Id.* at 10:46:30). Police officers were permitted to question Defendant during Defendant's treatment. Although Sergeant Schmit testified that he would expect painkillers to be administered to a gunshot victim, Defendant's Exhibit C indicates that Defendant did not receive painkillers (i.e., intravenous fentanyl citrate) until 11:00 p.m., less than twenty

minutes before the search in question. (Def. Ex. C at 24). Sergeant Schmit heard no discussion of the administration of painkillers and I heard none when reviewing the body camera videos.

Defendant told officers that he was on his way to the Casey's gas station near Coe College to purchase cigarettes when he was approached by two Black men who asked for the time. (Brown video at 10:35:29-10:44:37). Defendant reported he was jaywalking in the middle of the street in front of a church on the southeast side of First Avenue closest to Casey's. (*Id.*). Defendant said that the next thing he knew, he heard "two or three shots," fell in the snow, and walked/ran directly to the hospital. (*Id.* at 10:36:15- 30, 10:40:00-02; Rink video at 10:40:01-03). Defendant did not recognize his assailants, but was able to describe some of the clothing they wore. Defendant was wincing in apparent (and understandable) pain as he told this story. (*E.g.* Brown video at 10:35:57, 10:36:32, 10:40:13). Defendant told Officer Brown that he was coming from a bar downtown, but could not remember the name of the establishment or the streets he walked on. (*Id.* at 10:37:49-10:38:36). When asked to clarify his story, Defendant stated that one of the assailants got close to him, stopped him, and asked for the time, to which Defendant responded, "Get a watch." Then one of the assailants grabbed at Defendant's pockets, "tussled" with Defendant for about two seconds, and the next thing Defendant knew, he heard "pop, pop . . . two shots." (*Id.* at 10:58:03-35, 11:00:53). Defendant told somewhat inconsistent stories regarding where he lived and how long he had lived in Cedar Rapids, eventually admitting that he was currently couch-surfing. (*Id.* at 11:04:40-11:28:41). Officers tried to piece together just where Defendant was shot and how he came to be at that location.

During the time that he was being treated and questioned by police officers, Defendant had his smartphone in his right hand and engaged in apparently friendly and concerned telephone and/or video conversations with third parties. Defendant appeared to follow these conversations and participate in them without hesitation.

At 11:17:07 p.m., after a health care worker told Defendant he did not require surgery and as she was preparing to clean his wound, Sergeant Schmit asked Defendant, "What's in your backpack?" (Rink video at 11:17:07). Defendant responded, "You can go check it," and gestured toward the backpack. (*Id.* at 11:17:12). At 11:17:49 p.m., when Officer Brown was explaining a records release form to Defendant, Sergeant Schmit picked up Defendant's backpack, unzipped it, and searched the

backpack. (*Id.* at 11:17:49-11:18:26). At one point, Defendant looked over, saw what Sergeant Schmit was doing, and asked, "What's going on?" (*Id.* at 11:18:26). Sergeant Schmit stopped searching and put down the backpack. Before anyone could answer Defendant's question, Defendant turned his attention back to a video call. During his search, Sergeant Schmit found the ammunition that is the subject of the instant motion. (*Id.* at 11:18:54 (Sergeant Schmit stating, "A bag a bullets in there.")).

While a health care worker was attending to Defendant's wounds and Defendant was on the phone, Sergeant Schmit asked Defendant, "I can check your pants pockets, all that, your coat?" (Brown video at 11:18:41-45). Defendant answered, "Go for it. I don't care." (*Id.* at 11:18:46). While Sergeant Schmit searched Defendant's clothing, Officer Brown photographed the contents of Defendant's backpack and removed the bullets from the backpack. (*Id.* at 11:20:37-11:21:00). When Defendant saw Officer Brown give Sergeant Schmit a piece of mail from the backpack, he said, "You see that—open it up." (*Id.* at 11:21:56; Rink video at 11:21:56). When Sergeant Schmit did so, Defendant said, "Hey, that's a federal offense, man. What you doing?" Sergeant Schmit answered, "It was already opened. You said, 'Open it up.'" Defendant said, "No. No, I. . . ." and started giggling. (Rink video at 11:22:05-10). Sergeant Schmit interrupted Defendant's giggling by referring to the piece of mail and asking, "You don't live in Marion anymore?" (*Id.* at 11:22:12). Defendant explained, "Nah, that's what I was talking about by Happy Joe's." Sergeant Schmit said, "Oh, yeah, that is by Happy Joe's," which apparently cleared up some of the earlier confusion about Defendant's previous address. (*Id.* at 11:22:15). Defendant expressed surprise that officers found bullets in his backpack. (*Id.* at 11:41:08, 11:41:53, 11:42:43). Defendant refused to sign the property receipt for his coat and the ammunition found in his backpack because he denied that the ammunition was his. (*Id.* at 11:43:46). Sergeant Schmit said that was fine.

Officers expressed skepticism about Defendant's story. Officer Brown told Defendant, "I can't help but feel there's information you don't want to tell me. . . . It seems like you know more about this than you want me to know." (Brown video at 10:52:24-42). Officer Brown told fellow officers, "He said a lot of things that I question. . .. So, he's a big fat liar." (*Id.* at 10:54:30-41). Officers Brown and Rink also opined that if someone was coming from the downtown bars and wanted cigarettes, the Casey's on Eighth and Second would be much closer than the Casey's by Coe College. (*Id.* at 10:55:41-45). Officer Rink shared this skepticism with Defendant's

friend, P.T., who came to the hospital after seeing Defendant's Facebook post from approximately 10:30 p.m. stating that he had been shot. (Rink video at 11:27:30-55, 11:29:13-15).

There were times during the interview that Defendant was apparently in pain or distracted by his treatment when he asked officers to stop asking him questions. For example, early in his treatment, when a health care worker was trying to draw blood, another member of the medical team admonished Defendant, "I know you are trying to tell your story, but please hold your arm still so she can poke you." (Brown video at 10:39:39). Defendant turned to Officer Brown and said, "Please let these doctors do their job." (*Id.* at 10:39:49). At 11:17:55 p.m., Officer Brown tried to obtain Defendant's signature on a medical records release form. Officer Brown started explaining the form to Defendant, who was in apparent pain, and said, "Can I talk to you all later, man?" The health care worker attending to Defendant said, "I'll give you a break," and stopped what she was doing. Defendant said, "No, I'm talking to them," and gestured toward the officers. (*Id.* at 11:18:00-06). Officer Brown continued to ask Defendant to sign the records release form. Defendant asked Officer Brown if he could sign the records release later. (*Id.* at 11:18:15). Defendant then answered a telephone call and Officer Brown let the topic rest.

The officers' investigation continued after the search, including the interview of P.T. While the following facts may not be highly relevant to the issue before the Court, they shed some light on the difficulty officers faced in obtaining solid information to respond to the shooting. P.T. said that she had dropped Defendant off at Casey's by Coe College at about 9:30 p.m. after he had spent the afternoon and evening at her home with her daughter and her playing drums and generally hanging out. (Rink video at 11:26:20- 11:27:30). She offered video proof to support her story. P.T. stated she picked Defendant up from the downtown Cedar Rapids bus station and confirmed that he had been drinking, stating that she and Defendant had consumed two pints of Remy during the course of the day and evening. (*Id.* at 11:30:46-11:31:08). She said Defendant "might be" intoxicated, but also hastened to add that Defendant had consumed the Remy over an extended period of time. (*Id.* at 11:30:42).

After Officer Rink interviewed P.T., he asked Defendant to "run [him] through what happened" one more time starting at noon. (*Id.* at 11:44:39-47). Defendant's version of his day mirrored in some ways what P.T. had told Officer Rink, but varied in other ways. Although Defendant did have to pause and think about his answers to Officer Rink's questions,

his answers did not waiver. Defendant stated that he had been in Maquoketa, Iowa in the morning, but was dropped off at a house on the southeast side of Cedar Rapids around 11:00 a.m. by his "ex." (*Id.* at 11:45:00-30). Defendant said that P.T. then picked him up sometime before noon on Fourth Street and Bever Avenue after he called her to do so. (*Id.* at 11:45:43-11:46:54). He said he spent the rest of the day and evening at P.T.'s house with P.T. and her daughter until dark, although Defendant could not recall the exact time. (*Id.* at 11:47:11-51). Defendant then first said that he had P.T. drop him off at HyVee, but then said that P.T. dropped him off in the McDonald's parking lot. (*Id.* at 11:47:55-11:48:12). Defendant went to McDonald's, then "walked downtown, had a few beers—maybe three." (*Id.* at 11:48:20-35). Defendant could not remember the names of the bars where he had been, but did offer that they were "several bars on the left side." (*Id.* at 11:48:39-43).

Defendant then decided to purchase cigarettes at Casey's, but never made it to Casey's because he was intercepted and shot on his way to the gas station. (*Id.* at 11:49:10-21). Although Defendant could not identify his assailants, he thought he might know the man who stood in the background and whom Defendant thought was the shooter because he kept himself hidden in the shadows and never spoke. (*Id.* at 11:50:47-55). Officer Rink again sought clarification of where, exactly, Defendant was standing when he was shot. Defendant insisted that he was standing "kitty-corner from the church" when he got shot and that he had not even made it to the alley by Casey's. (*Id.* at 11:51:23-27.) Sergeant Schmit confirmed that Defendant was talking about a location "between Second and the alley." (*Id.* at 11:51:40-44.).

(Doc. 37, at 3–10) (internal footnotes omitted).

## IV.    ANALYSIS

The Fourth Amendment protects people from unreasonable searches and seizures of their person or property. *See* U.S. CONST. amend. IV. Our understanding of what constitutes a search is rooted in two distinct legal foundations: property and privacy. Thus, a search may occur when the government physically intrudes upon "persons, houses, papers, and effects," *Florida v. Jardines*, 569 U.S. 1, 5 (2013), or infringes on an expectation of privacy that society is willing to recognize as reasonable. *See Katz v.*

*United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). Warrantless searches are presumptively unreasonable and therefore precluded by the Fourth Amendment, subject to a handful of "jealously and carefully drawn" exceptions. *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971) (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958)). One well-established exception to the warrant requirement is when law enforcement conducts the search with the voluntary consent of a person who has adequate authority over the place to be searched. *Schneckloth v. Bustamonte*, U.S. 218, 219 (1973).

The principal issue under consideration here is whether defendant voluntarily consented to the search of his backpack. Consent is voluntary when, based on the totality of the circumstances, it is "the product of an essentially free and unconstrained choice by its maker" and not "the product of duress or coercion, express or implied." *Id.* at 225, 227. In this assessment, the totality of the circumstance characteristics includes both the characteristics of the defendant and aspects of the environment in which consent is obtained. Characteristics of the defendant considered by courts include (1) the defendant's age, general intelligence, education, and level of intoxication, (2) whether law enforcement obtained consent after warning defendant of his right to withhold consent, (3) and whether defendant was "aware of the protections afforded to suspected criminals by the legal system" due to previous arrests. *United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990). Aspects of the environment considered by courts include whether (1) defendant was detained, (2) law enforcement questioned defendant for a long time before consent was granted, (3) law enforcement used threats, physical intimidation or punishment to obtain consent, (4) law enforcement used misrepresentations or promise, (5) defendant was in custody or under arrest, (6) defendant granted consent in a public or secluded place, and (7) defendant "objected to the search or stood by silently

while the search occurred." *Id.* These factors are not applied mechanically or formalistically. Rather, they are to be used to guide the Court's reasoning. *Id.*

Judge Roberts found that defendant voluntarily consented to the search of his backpack performed by Officer Brown. Judge Roberts specifically found that his conclusion of voluntariness was supported by (1) defendant's age and general intelligence, (2) defendant's knowledge of his ability to refuse consent, (3) defendant's knowledge of protections afforded to him based on his prior experience with the justice system, (4) absence of threats, intimidation, or misrepresentations by police, (5) the fact that defendant was not in custody, detained, or arrested, and (6) defendant's failure to object to the search. (Doc. 37, at 13–25) (citing *Schneckloth*, 412 U.S. at 219; *United States v. Griffith*, 533 F.3d 979, 984 (8th Cir. 2008)). Judge Roberts also found that although defendant was intoxicated to some degree, he was not intoxicated to the point where his consent would be ineffectual. (*Id.*, at 25–29).

Defendant objects broadly to Judge Roberts' conclusion that defendant's consent was voluntary. (Doc. 40, at 2–5). Defendant lodges several objections to Judge Roberts' characterization of certain facts and argues that in the totality of the circumstances—when considered from the perspective argued by defendant—his consent was not voluntary. (*Id.*).

An assessment of a defendant's voluntary consent to a search is necessarily a fact-intensive affair. Judge Roberts' analysis is laid out factor by factor as described in *Chaidez* and defendant's objections are made accordingly. No single factor is dispositive and, despite the logically segmented structure of the R&R, all of the factors taken together must point to voluntary consent.

## 1. *Characteristics of Defendant*

Defendant disputes several of Judge Roberts' characterizations of facts relating to the characteristics of the defendant that inform the question of his voluntary consent and,

logically, disputes the inferences Judge Roberts drew from those facts. Specifically, defendant disputes the finding that (1) defendant could split his focus between multiple conversations at once, (2) defendant understood his right to withhold consent, (3) defendant's criminal history was sufficient to make him aware of his right to withhold consent, and (4) defendant's intoxication did not impair his ability to consent. (Doc. 40, at 2–5).

### a. Defendant's Split Focus

The Court agrees with Judge Roberts' assessment of the circumstances. After reviewing the police body camera footage from defendant's interaction with law enforcement, the Court finds that defendant was able to split his attention between officers and the medical staff tending to his gunshot wound. (*See* Brown video, at 10:35:25–11:17:30). Defendant ably answered questions from the officers while simultaneously complying with the directives from medical staff. (*Id.*). Defendant's interactions were far from seamless, but this is understandable given the circumstances. The hospital room where he was being treated and questioned contained as many as six medical staff and up to three officers at any given time. Defendant was bombarded by questions from law enforcement, directions and questions from medical staff, numerous personal phone calls on his cell phone, as well as distracting background noise of sidebar conversations of medical staff. Despite the cacophony arising from this activity, defendant lucidly answered questions and relayed information about the shooting to the officers on scene, often pausing briefly to address questions from medical staff, and all without appearing to become overwhelmed or confused. Defendant's reactions and demeanor during this time indicates at least average intelligence and a mental state that is capable of making a free and unconstrained choice. Defendant's objection on this ground is **overruled**.

### b. *Defendant's Understanding of His Right to Withhold Consent*

Judge Roberts' assessment of defendant's understanding of his right to withhold consent is equally sound. Although not precisely analogous, the parallel between defendant's acknowledgement of his ability to refuse medical treatment and knowledge of his ability to refuse to consent to a search is drawn from the same foundational question, that is, whether defendant possessed the state of mind required to make a free and unconstrained choice. Further, Judge Roberts did not offer this analogy to prove that defendant's consent was voluntary. Rather, Judge Roberts plainly intended the analogy to refute the claim that defendant was too "intoxicated, under the influence of pain killers, and/or in pain" to be able to exercise agency. (Doc. 37, at 13–14). The Court agrees with Judge Roberts that defendant's understanding and exercise of free choice regarding medical decisions—while not dispositive—supports the conclusion that defendant was capable of exercising similar agency in providing consent for a search. Defendant's objection on this ground is **overruled**.

### c. *Past Interactions with Law Enforcement*

The Court is also unpersuaded by defendant's argument that his past interactions with law enforcement actually serve to cloud his understanding of his rights rather than clarify them. This argument is premised on a presumption of police misconduct in past interactions for which defendant offers no evidence. Even if police do "sometimes self-interestedly or inaccurately portray the" protections afforded to a criminal suspect, there is no evidence that such conduct occurred in this defendant's past interactions with law enforcement. (Doc. 40, at 2). Defendant's argument requires the Court to engage in quite cynical speculation about what could be supported by defendant's "active suspicion of police" officers. (*Id.*). The Court declines to do so.

Further, defendant's argument demands a factual inquiry into defendant's past police interactions that is not required by precedent. Rather, past contact with law

enforcement is considered as affirmative support for knowledge of a defendant's rights in its own right. In *Watson*, the Supreme Court found the defendant's consent to be voluntary because, in part, defendant was not "a newcomer to the law." *United States v. Watson*, 423 U.S. 411, 424–25 (1976). This language suggests an analytical binary and the treatment of this prong by lower courts support that conclusion. Thus, either a defendant has had past interactions with law enforcement and may be presumed to be aware of his rights or a defendant has not had past interactions and cannot be presumed to be aware of his rights. The Court has found no case contradicting this conclusion and defendant cites none. Defendant here has had past run ins with law enforcement and can therefore be presumed to be aware of his rights as a criminal suspect. *See United States v. Barnum*, 564 F.3d 964, 971 (8th Cir. 2009) ("Based on [defendant's] previous arrests, we may infer that [defendant] was aware of the rights afforded to criminal suspects.") Defendant's objection on this ground is **overruled**.

### d.    *Defendant's Intoxication*

Defendant also objects to Judge Roberts' conclusion that defendant was not so intoxicated that his ability to voluntarily consent to a search was impaired. (Doc. 40, at 4–5). Judge Roberts found that although defendant was intoxicated, he was not "so intoxicated that he [was] not competent to understand the nature of his acts." (Doc. 37, at 25–26) (quoting *United States v. Hardison*, 859 F.3d 585, 591 (8th Cir. 2017)) (internal quotations omitted).

Judge Roberts rightly described this issue as the most salient factor under consideration relating to defendant's ability to voluntarily consent. (*Id.*, at 13). Hospital records reflect that defendant was administered fentanyl intravenously at 11:00 PM, approximately seventeen minutes before he consented to the search of his backpack. (Doc. 35, at 25). As defendant notes, the effects of fentanyl are almost immediate when

administered intravenously. (Doc. 34, at 4). Further, alcohol in defendant's system would amplify the effects of the fentanyl. *Id.*

Defendant acknowledges that "intoxication, alone, does not invalidate consent to search." (Doc. 37, at 25); (*see also* Doc. 34, at 4). Defendant places significant weight on this factor, however, arguing that "any person would reasonably assume" that being under the influence of alcohol and fentanyl at the same time would render a person incapable of voluntarily consenting to a search. (Doc. 40, at 5).

The Court disagrees. As defendant points out, there is no dispute as to whether defendant was intoxicated. (*Id.*). The Eighth Circuit Court of Appeals has repeatedly found consent to be voluntary when a defendant's conduct indicates that he "knew what he was doing and had a reasonable appreciation of the nature and significance of his actions." *United States v. Watters*, 572 F.3d 479 (8th Cir. 2009) (quoting *United States v. Castellanos*, 518 F.3d 965, 969 (8th Cir. 2008)). The court in *Watters* concluded that although the defendant was indisputably intoxicated, his age and criminal history supported a finding of voluntariness. *Id.* at 483. Officers in *Watters* did not threaten, coerce, or make any promises to the suspect during their interaction. *Id.* Further, the public setting, the length of the incident—less than one hour—and the suspect's ability to clearly answer questions supported that conclusion.

Taking defendant's intoxication as one factor to be considered among many—as the Court must—the Court reaches a similar conclusion. Defendant was approximately 40 years old at the time of the incident and had enough criminal history to be aware of the procedural safeguards available to him. Officers did not threaten, coerce, bully, intimidate or make any promises to defendant. The setting was open enough to dispel any concerns about implied pressure from officers or negative effects of defendant being isolated and without support. The length of time that elapsed before defendant consented to the search was at most well under one hour.

Crucially, defendant's interactions with officers and medical staff indicated that he was capable of making decisions and appreciating the consequences of those decisions. The most compelling evidence of this is that defendant refused to sign the property receipt for the bullets found in his backpack based on his belief that the receipt was not true and plainly the potential that his signature would be an admission that the bullets belonged to him. (Rink video, at 11:43:46). It seems implausible that defendant would have had the presence of mind to simultaneously appreciate the incriminating nature of some his actions but not be able understand his ability to deny consent to a search. The Court finds that defendant's intoxication did not overcome his ability to rationally evaluate his actions. Defendant's objection on this ground is **denied**.

### 2. *Aspects of the Environment*

Defendant also raises several objections to Judge Roberts' conclusion about the effect of the surrounding environment at the time of defendant's consent. Specifically, defendant objects to the conclusion that (1) defendant was not in a secluded place when he consented, (2) the length of the interview was not longer than necessary, (3) defendant did not object to the search, and (4) defendant's statements while Sergeant Schmit opened defendant's mail demonstrate consent. (Doc. 40, at 2–4).

### a. *Secluded Location*

The Court agrees with Judge Roberts that defendant was not in a secluded place at the time of his consent. (Doc. 37, at 16–18). It is true that defendant was questioned in a hospital room apart from other patients. This room was secluded in the very narrow sense that it was "screened or hidden from view"[1] of the general public. A close reading of the caselaw on this factor cautions against an overly technical understanding of the term, however. Courts that have examined this issue repeatedly contrast public places

---

[1] *Secluded*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/secluded (last accessed July 1, 2021).

like a parking lot or public street with secluded places like the inside of a police station. *See, e.g.*, *Barnum*, 564 F.3d at 971. The term secluded in this context should therefore be understood as meaning some place away from prying eyes where a suspect would feel isolated and law enforcement officers would be able to exert their will. The seclusion in such a scenario must be considered not as a simple descriptor of the environment but as a factor that contributes to a suspect's free will being overcome. The purpose of this inquiry is not to mechanically describe the environment and assign each factor to one side or the other. Rather, the goal is to determine what effect certain aspects of the environment had on a defendant's ability to voluntarily consent. Formalistically ascribing the appellation "secluded" or "not secluded" without further consideration fails to accomplish this goal.

Here, the room where defendant was being questioned—ostensibly private and "on lockdown"—was bustling with people. Medical staff came and went at will. As defendant points out the hospital "was on lockdown" due to defendant's appearance with a gunshot wound. (Doc. 40, at 3). The term "lockdown" may sound ominous, but in this context it was merely a safety precaution against further potential violence. The lockdown prevented others from entering the emergency room, but it did not prevent anyone—including defendant—from leaving. The emergency room lockdown was not intended to isolate or restrain defendant in the way a lockdown in a prison may be intended. Nor did it have that effect. The room where defendant was being treated may not have been observable to the general public, but it was very accessible to disinterested third parties who certainly would not have tolerated police coercion had they witnessed it and whose presence would have deterred such conduct. Defendant's objection on this ground is **overruled**.

### b. *Length of Interaction*

Defendant disputes the finding that the interview was not longer than necessary and argues that the length of the interview—approximately 80 minutes—contributed to overcoming defendant's will when considered in the context of defendant's physical and mental state. (Doc. 40, at 3).

Defendant was under significant stress due to his injury. While he began the interview amicably, he became increasingly agitated as questioning continued, at one point stating to a third party on his cell phone "They[re] treating me like I did something." (Brown video at 11:19:45–49). Defendant did attempt to end the interview several times, albeit halfheartedly. The ongoing nature of the questioning coupled with his fatigued state may have contributed to a sense by defendant that the police would not leave until he told them what they wanted to hear.

On the other hand, the length of the interview was necessitated to some degree by defendant's ongoing medical treatment. Questions from the officers often came in between questions and directions from medical staff. Not only did law enforcement leave the room entirely on several occasions to allow for hospital staff to treat defendant, they also ceased questioning entirely numerous times to allow for defendant to take personal phone calls. Thus, although approximately 80 minutes elapsed from law enforcement's first contact with defendant to the end of the interview, the questioning was not continuous. Further, as Judge Roberts noted, the interview began cordially and did not become inquisitorial until officers became suspicious of defendant's implausible or contradictory responses. Unlike a jailhouse interrogation where police bring a suspect for the express purpose of eliciting incriminating information—and utilize rhetorical tactics designed to this end—defendant was not a criminal suspect throughout the duration of the interview and law enforcement here did not treat him as such until well into the interview.

Additionally, the interview continued for some time after defendant consented to the search and law enforcement discovered the ammunition. Officer Brown made first contact with defendant at approximately 10:35 PM and defendant granted Sergeant Schmit consent to search his backpack at approximately 11:17 PM. Not taking into account disruptions or pauses in questioning, the length of the interview prior to the alleged violation was only approximately 42 minutes. Whatever effect the additional length of the interview had on defendant after consent, that time should not be considered when considering how the length of the interview may have overborne defendant's will at the time he consented.

Further, defendant was not actually in custody during this interview. Although he may not have felt that he was free to leave, the source of that feeling could only fairly be attributed to his need for medical treatment, not to the presence of law enforcement officers. This is not a case where law enforcement officers detained and questioned a defendant indefinitely in an effort to wear him down or wait out his resolve. *See Haynes v. State of Wash.*, 373 U.S. 503 (1963) (finding confession involuntary where defendant was held incommunicado and questioned for several days in order to secure confession). Instead, officers questioned defendant in a reasonable manner, in a neutral location, and in the sporadic presence of neutral third parties. Given these circumstances, the amount of time officers questioned defendant was appropriate. This factor weighs in favor of defendant's knowing and voluntary consent. Defendant's objection on this ground is **overruled**.

### c. *Objection to Search*

Defendant objects to Judge Roberts' conclusion that defendant's statement "you can check it" constituted consent to search the interior of his backpack. (Doc. 40, at 4). Defendant further objects to Judge Roberts' conclusion that defendant did not object to the search. When Sergeant Schmit began to search defendant's backpack, defendant

stated "What's going on?" (Brown video, at 11:18:26). Defendant argues that this statement demonstrates his "general disorientation" and represents a withdrawal of consent that defendant previously granted. (Doc. 40, at 3–4).

The Court finds defendant's arguments unavailing. During a conversation about what defendant's assailants stole from him, the following exchange occurred:

Schmit:      What's in your backpack?

Defendant:   You can go check it if you want. [Defendant gestures toward backpack.]

Schmit:      But they didn't ask for that or nothing?

Defendant:   They probably thought I had something in it. Yeah.

(Rink video at 11:17:05–11:17:50).

Sergeant Schmit specifically asked defendant what was *in* the backpack. In response, defendant told Sergeant Schmit that he could check the backpack. In the context of Sergeant Schmit's question, defendant's suggested interpretation—that "check" refers to a visual exterior inspection—is simply unreasonable. Further, defendant's interpretation of his statement is irrelevant. Indeed, whether defendant's consent is valid turns on "whether the officer reasonably believed the defendant consented." *United States v. Garcia*, 957 F.3d 887, 892 (8th Cir. 2020) (quotations and citations omitted). Sergeant Schmit's interpretation of this exchange—that defendant consented to a search of the interior of the backpack—was eminently reasonable. Defendant's objection on this ground is **overruled**.

### d.      *Withdrawal of Consent*

The Court also rejects defendant's argument that he withdrew his consent when he said, "What's going on?" Once granted, consent may be withdrawn at any time provided that the intent to withdraw is unequivocal. *United States v. Sanders*, 424 F.3d 768, 775

(8th Cir. 2005) (internal quotations and citations omitted). "If equivocal, a defendant's attempt to withdraw consent is ineffective and police may reasonably continue their search pursuant to the initial grant of authority." *Id.* Here, not only was defendant's statement ambiguous as to his intent to withdraw consent, it is not even clear that defendant was speaking to the officers when he made the statement. (Brown video at 11:18:26). Seconds earlier, defendant answered a phone call stating, "What's up niece?" After a brief pause, defendant stated, "What's going on," and after another short pause repeated, "What's up niece?" (*Id.*, at 11:18:16 – 11:18:33). These three statements were made in the same flat tone of voice, with no indication that defendant was interrupting his call to direct his comment to the officers. Indeed, defendant did not seem at all alarmed or upset about anything the police may be doing. Defendant made no attempt to follow up with his objection to the officers' conduct and by every indication in the video was unconcerned with what they were doing with his things at that time. By all appearances, defendant was simply having difficulty operating his phone with one hand. Thus, defendant did not effectively withdraw his consent to search the backpack. Defendant's objection on this ground is **overruled**.

### e. *Defendant's Mail*

Defendant also objects to Judge Roberts' finding that defendant's statements to police officers as they opened defendant's mail tend to show the voluntariness of his consent. (Doc. 40, at 4). At one point during the search of defendant's backpack, Officer Brown found an envelope which he handed to Sergeant Schmit. (Brown video 11:18:46). Seeing this, defendant stated, "You see that? Open it up." (*Id.*). Sergeant Schmit did so and defendant stated, "Hey! That's a federal offense man!" (*Id.*). Clearly confused, Sergeant Schmit replied, "It was already opened. You said, 'open it up.'" (*Id.*). Defendant then said, "No. No, I. . . ." and his sentence trailed off into a fit of laughter. (*Id.*).

Defendant contends that his statements "militate against knowing and voluntary consent" because they tend to show the defendant was attempting to withdraw his consent or were at least equivocal as to his intent. (*Id.*). This contention is misplaced for the same reason that defendant's initial withdrawal was ineffective. In the Court's assessment, this exchange was nothing more than defendant's attempt at a joke. This conclusion is supported by the fact that defendant could barely utter what was meant to be the punchline before he devolved into laughter. Further, this conclusion comports with the generally non-adversarial character of the interview at that point. Taken as such, it simply cannot be considered to constitute withdrawal of consent which, as discussed above, must be unequivocal. Far from having his will overcome, the Court finds that defendant's banter with police indicates that he was relatively at ease in their presence. The Court agrees with Judge Roberts' conclusion that this exchange supports a finding of voluntariness. Defendant's objection on this ground is **overruled**.

## V. *CONCLUSION*

For the reasons described above, the Court finds that defendant's consent to the search of his backpack was voluntarily given. Defendant's objections to the R&R (Doc. 40) are **overruled**. The Court adopts Judge Roberts' R&R (Doc. 37) without modification. Defendant's motion to suppress is **denied**. (Doc. 24).

**IT IS SO ORDERED** this 7th day of July, 2021.

_____
C.J. Williams
United States District Judge
Northern District of Iowa